ST. LOUIS SOUTHWESTERN RAILWAY COMPANY *v.* BYRNE.

Opinion delivered December 24, 1904.

1.  APPEAL—CONCLUSIVENESS OF VERDICT.—A verdict rendered upon conflicting evidence will not be disturbed on appeal because it seems to be against the preponderance of the evidence.  (Page 383.)

2.  NEW TRIAL—EVIDENCE NOT PRODUCED AT TRIAL.—A verdict will not be set aside on account of evidence not produced at the trial if appellant knew of the evidence at the time of trial, nor for newly discovered but merely cumulative evidence.  (Page 385.)

Appeal from Miller Circuit Court.

JOEL D. CONWAY, Judge.

Suit by Rosa E. Beasley against the St. Louis Southwestern Railway Company.  Plaintiff recovered judgment, from which defendant appealed.  Pending the appeal plaintiff died, whereupon the cause was revived in the name of Lawrence A. Byrne, administrator *ad litem.*

Affirmed.

STATEMENT BY THE COURT.

Appellant seeks by this appeal to reverse a judgment of $5,000 in favor of appellee for personal injuries. The grounds insisted upon here are a want of evidence to support the verdict, contributory negligence, and newly discovered evidence.

The proof on behalf of appellee tended to show that on August 7, at 2:40 a. m., she boarded appellant's passenger train at Pine Bluff. She intended to go to Texarkana, but the night clerk, whom she had entrusted to buy her ticket, had by mistake bought her ticket to Camden. When the conductor came through taking up tickets, she informed him that she wanted to go to Texarkana, and he informed her that she could get off at Camden, and get a new ticket, and have her trunk·rechecked on to Texarkana. After passing Eagle Mills the conductor announced that Camden would be the next stop, and said to appellee: "When we pull up, you get up, and step out, and get your ticket, and you will have plenty of time to get your ticket, and get your baggage checked." When the train stopped, appellee got up, and left a lunch box and bandbox in the seat to keep any one from getting it. The train did not move up to depot; was about fifty yards away. There was no platform where she attempted to get off, and there was no one there to show her. She did not know on which side the depot was, and got off on the west side. As she was standing on the last step, the train moved backward, then forward with a sudden jerk, throwing her off about eight or ten feet. She fell upon her left shoulder and side. From the way the passenger train whistled, it was then about the city crossing. When she came to herself she raised upon her elbow, and noticed that the train was going. She went to the depot, and around back of the depot to the Terminal Hotel, where she got a room, and stayed all day, and suffered pain. While she was at the hotel, the depot agent came over to see her. She was in bed at the time. The lady of the hotel held the door ajar, and stood in it, and she talked to the agent, who stood on the outside. Her bandbox was left on the train, and the agent said he would try to get it. He came over again, and told her the box had come. She went over in the afternoon, and got the box. There was written on the box "Agent, Camden, Arkansas, a lady's at Camden that got off at the Iron Mountain crossing." The agent at Camden

said to her, "If you didn't get off at the crossing, that isn't your box." She informed him that it was her box, but that she did not get off at the crossing. She took the train that night for Texarkana. After arriving home, she was confined to her bed for two months. Dr. Wisdom attended her. For weeks she could not raise her neck when in bed to take a drink of water; weighed when hurt 139 pounds; weighed at the time of trial 110; was still affected in neck, lungs and back; could not use her left arm much.

On cross examination appellee denied that she had borrowed $2.50 from one Robinson to go to Camden on, but said that instead he had paid her $4 in silver for her work. He was proprietor of the hotel at Pine Bluff where she worked. She had passed the depot at Camden before, but did not know which side it was on. Said train did not stop between Eagle Mills and Camden, but slowed up at river. She did not go to sleep between Eagle Mills and Camden. She did not see the conductor after she passed the station at Camden. Did not know Sam McGill. Did not meet the depot agent at Camden with Sam McGill that day, and did not say to Sam McGill that she got off at the C. & A. crossing. Did not say to them that after she got off at the C. & A. crossing, as she came down the embankment, the grass was wet with dew, and her feet slipped out from under her, and that was the way she fell. Did not say to the conductor on train after she passed the station at Camden, and before she reached the C. & A. crossing, that she had gone to sleep, and passed the station without knowing it. The conductor told her to stay on train, and when he came to McNeil he would give her a ticket back to Camden. He stated that at Camden the train had thoroughly stopped before she got out of her seat; could not tell how long it had been still. It was as long as three minutes. It is simply guess work.

Dr. Wisdom, who attended her at Texarkana, said that when called in he found her suffering considerable pain in her neck and chest, and considerable soreness in her back. She had some difficulty in moving her head; could not raise her head without putting her hand back, and then not without considerable pain. He thought from the character of the injury that it came near breaking her neck. In his opinion a fall on the head from a train would cause the injury, but that slipping on the grass would not.

The injury in her chest at first didn't seem to be serious; afterwards it became more grave in its character. Some days after that, she had a hemorrhage from her bowels, which indicated some internal injury in the bowels. He couldn't just locate where it was. He thought a violent shock or fall might possibly have produced that. When he first saw her, he didn't regard the injury as very serious, as it afterwards developed to be. She suffered considerable pain in her chest and bowels, and more pain possibly in the back of her head and neck. And, as to being able to judge the effect of this injury, couldn't tell whether it would be of long or short duration. There were no bones broken. The internal injuries were more manifest in the pulse than anything else. They were very much increased in beating. He attended her several weeks. A week or ten days after the injury he was a little apprehensive about her; thought perhaps the injury might prove fatal. He regarded her as suffering great pain. She was greatly reduced in flesh.

Mrs. Vann, a witness for the plaintiff, testified as follows: "I live in Texarkana, and know Rosa Beasley; have known her since the 3d of July. She was apparently in good health when I first knew her. She went to Pine Bluff on the 3d of August. She had been at my house up to that time from July 3. She came back to my house on the 8th of August in bad condition. I had to help her in the house, and put her to bed. Her shoulder and back were bruised, and she was complaining of her head, neck, shoulders and side. She was suffering great pain. She remained at my house in that condition about six weeks, and went to De Queen, and returned in about six weeks. She is not able to do anything now. When at my house, I am her sole attendant. She suffers more pain in her neck and head than in any other part. She is very nervous. She has nervous prostration. Any little thing coming through the house throws her into a state of nervousness. She had improved some when she went to De Queen. She doesn't sit up now for a whole day at a time. I never knew her before July 3. She is boarding with me. She has complained of the same character of suffering from the time she came to my house up until now. She still complains of her side, chest, head and neck. There is very little improvement in her. Of course, she is able to sit up, and she wasn't when she left my house."

Dr. P. M. Agee, a witness for plaintiff, testified: "I live at Texarkana. I am a practicing physician. If I have any specialty, it is diseases of the bones and nerves. It is called Osteopathy. Have been in this line of practice three years. Reside in Texarkana, Ark., and have resided here about one year. I know Rosa Beasley, and have examined her. There is a slipping of the third vertebræ. It is slipped to the right. The fifth is slipped slightly to the left. The fourth, between the third and fifth, is in proper place. The vertebræ are, in common parlance, joints of the backbone. The third being slipped to the right and the fifth to the left make a crooked backbone, and lessens the caliber of the hole through which passes the spinal cord. There is pressure on the spinal cord there, and necessarily the health is bad for the future without it being corrected. It is a matter of conjecture whether it may or may not be cured. I think it will produce pain. I never treated the plaintiff. I made first examination three or four weeks ago, and only one time. That was at my office of the Foreman building. My opinion is that the backbone presses against the spinal cord. I can not tell how long after a fall before it would take effect. It might be an injury to the nerves that would make a contraction of the muscles and draw the bone out of the place when it had not been thrown out of the place by the fall. And it might have been done by the fall. This might occur without any particular notice, and without pain resulting immediately. Sometimes these things happen, and nobody can be able to say how it occurred and when it occurred. A person might get a fall and receive a shock, but the result of the injury wouldn't be felt until afterwards."

Appellant's counsel summarize the evidence on its behalf, and state the reason why the case should be reversed on the facts as follows:

"In the first place the testimony of witness Robinson, the hotel keeper at Pine Bluff, shows that she stated falsely as to the amount she borrowed from him, and that she deceived him into believing she had a sick sister at Camden. She stated to him she did not have money sufficient to bear her expenses to Camden, and yet in rebuttal she says that she had between $10 and $15 and that she had not intended to visit Camden, but was going to Texarkana.

"It is shown that the yards at Camden were covered with packed cinders, and she could not have gotten mud and grass stain on her by falling there. Sam McGill and W. E. Gipson both testify that she was muddy, and that she called their attention to this condition of her clothes as a reason why she wanted to get into her trunk. It is undisputed that her clothes were stained with mud and grass.

"The conductor, Thompson, testifies that she was on the train after it passed Camden, and that he missed her soon after the train passed the C. & A. crossing, which is a mile or more south of the station at Camden. The witness, James Hooker, who was also a passenger, without interest of even remote degree, relates the whole thing, showing that she did jump off at the C. & A. crossing of her own volition. She undoubtedly told McGill and Gipson that she was not hurt, and she told Mrs. Kilmer that she stepped on the grass and fell. Her statements to McGill and Gipson, in the presence of Mrs. Kilmer, the proprietress of the Terminal Hotel, shows that her testimony on the trial was not the truth, and was an afterthought inspired by avarice and nursed by a seared conscience. In addition to this, she is shown to be unworthy of belief by the testimony of Mr. Skinner, Sheriff Warren, Mr. H. V. Beasley, and finally by her own witness, Dr. Hartsfield. The last was put on by herself to prove good character, and, when put to the test, he fully corroborated the others.

"Finally for fear her case was too weak, she testified that Thompson was not the conductor; that it was Will Alexander. Gipson and McGill then testified that Alexander did not run train No. 3 at all. With the motion for a new trial is filed the affidavit of Will Alexander showing that he was not the conductor, and that he never run on the train No. 3. Besides, Gipson's affidavit from the train register shows that Alexander did not run any train for several days prior and following that date. The affidavit of Mrs. Kilmer, filed with the motion for a new trial, shows that the testimony of agent Gipson and Sam McGill as to the statement of plaintiff to them was absolutely correct. Sam McGill says that plaintiff did not leave Camden until the next day, notwithstanding plaintiff says she left Camden that day. McGill is sustained by plaintiff's witness, Mrs. Vann, who said she returned on the 8th of August."

*S. H. West* and *Gaughan & Sifford,* for appellant.

*Byrne & Lewis,* for appellee.

WOOD, J., (after stating the facts.)    Appellant contends, first, that there is no evidence to sustain the verdict.    The reason assigned is because plaintiff's testimony is shown to be so clearly false that a finding for her on her evidence indicates prejudice on the part of the jury.    It is very true that plaintiff was flatly contradicted in many particulars and by several witnesses.    It is also true that her character for truth and morality was impeached by several witnesses.    Still, the jury were the sole judges of the weight of the evidence and the credibility of the witnesses.    Under long established rules of this court, we are not authorized to set aside a verdict because there is a conflict in the evidence, however sharp, and because the verdict seems to us to be against the decided preponderance of the evidence.    We will not invade the province of the jury to settle disputed questions of fact.    *St. Louis, I. M. & S. Ry. Co.* v. *Wilson,* 70 Ark. 136; *St. Louis, I. M. & S. Ry. Co.* v. *Osborn,* 67 Ark. 399; *St. Louis & S. F. R. Co.* v. *Kilpatrick,* 67 Ark. 47; *Catlett* v. *Ry. Co.,* 57 Ark. 461.

No matter how untruthful or immoral the plaintiff may have been, there is no doubt whatever that she was severely and seriously injured.    How was it done? ·

Appellant, while conceding the injury, introduced witnesses to show that it was not caused in the manner stated by apellee. Witness Hooker, who claims to have seen appellee jump from the train after it had passed Camden station, and near what is called in the record "the C. & A. crossing," says: "She didn't fall, to my knowledge."    Other witnesses (McGill and Gipson) say that appellee told them that when the train stopped at the C. & A. crossing she got off, and in turning to walk off of the embankment, which was three or four feet high, she slipped on the grass, wet with dew, and fell to the ground, but was not hurt.    Thus was presented to the jury by appellant's only eyewitness, whom counsel designates as "a passenger without interest of even a remote degree," the theory that appellee jumped from the train but did not fall at all.    Then, by two other witnesses, who were employees of appellant, the theory that, according to appellee's own statement, she did not jump from the train, and that she fell after getting off, but was not hurt.

Appellee's own account of the matter was that she was thrown violently from the train by a sudden jerk, falling on her shoulder and side; that she was confined to her bed by reason of the injury for over two months; that she could not raise up to take a drink of water when in bed; was badly hurt in shoulder, neck, breast, lungs, and back, and that these were still affected at the time of the trial.

The testimony of the attending physician, who waited upon her several weeks, was to the effect that he found her suffering considerable pain from soreness in her neck, chest and back, and that she could not raise her head without putting her hand back of it, and that she had a hemorrhage from her bowels, indicating internal injury, and that, from the character of the injury, it came near breaking her neck. He gave it as his opinion that "a fall on the head from a train would cause the injury, while a fall from slipping on the grass walking along would not. The testimony of the lady with whom appellee stopped during her illness showed that, when appellee went to her house after the injury, she put her to bed where she remained for several weeks; that she suffered great pain, complaining of her head, neck, shoulders and side; that she continued to suffer even up to the time of the trial, not being able to sit up a whole day at a time.

The testimony of an Osteopathic physician who had examined appellee about three or four weeks before the trial showed that he found two of appellee's vertebræ slipped to one side, making a crooked backbone pressing on the spinal cord, and making the health bad; that it might have been done by a fall, or it might have been done by an injury to the nerves that would make a contraction of the muscles and draw the bone out of place, when they had not been thrown out by the fall. But other evidence showed that appellee had been in good health up to the time of the injury, and had been in bad health ever since.

From this testimony the jury doubtless concluded that the theory of the injury as put forth by appellee was entirely consonant with the truth, notwithstanding the palpable contradictions of her evidence and the severe impeachment of her character, and the jury also doubtless concluded that the manner of the injury detailed by her was credible and plausible, while the theory of the manner of the injury as put forth by the evidence for appellant was inconsistent with the undisputed character of

the injury itself, and wholly unreasonable. We could not say that such a conclusion of the jury was unwarranted. The gravamen of this controversy was the injury of appellee through appellant's negligence. If this was established, appellee maintains her cause of action.

Second. The court did not err in overruling the motion for new trial on the ground of newly discovered evidence. The testimony of Alexander was only to show that he was not the conductor on the train at the time appellee was injured. That could have been only cumulative of the testimony of Thompson, who testified that he was the conductor of that train, and not Alexander; also of the testimony of several other witnesses who testified that Thompson, and not Alexander, was the conductor. Furthermore, the testimony was not material, further than for the purpose of impeaching the testimony of appellee, and in this regard would have been only cumulative of much other evidence. The testimony of witness Mrs. Kilmer was not newly discovered, but is shown to have been known to appellant before the trial began. Besides, the testimony of this witness was also only cumulative. The witness Gipson, whose affidavit was attacked, was a witness at the trial, and the affidavit as to what the train register showed would have been only cumulative of the abundant evidence tending to show that Thompson, and not Alexander, was the conductor of the train at the time of appellee's injury, and thus would have contradicted her evidence on this point. *Railway Co.* v. *Dobbins*, 60 Ark. 481; *Holt* v. *State*, 47 Ark. 196.

Third. The appellant contends that appellee was guilty of contributory negligence, because she says in one place in her testimony that the train "was still as long as three minutes" after it stopped at the station before she got out of her seat. She precedes and follows this declaration with a statement that she "could not tell how long it had been still," showing that it was a mere matter of opinion on her part. But other evidence tends to show that she hurried out as soon as the train had stopped.

The jury settled the question of contributory negligence in favor of appellee, and we see no reason to disturb the verdict.

Affirm.